SOUTHWORTH ET AL, vs. HOPKINS' HEIRS.

## ERROR to St. Louis Circuit Court.

### *Statement of the Case.*

In this case, Thomas Southworth and wife and others, legal representatives of one John Buzan, filed their bill to enjoin proceedings at law, and for further relief, against Thomas Hopkins. The bill set forth that one Jonas Seely and wife, on the 15th day of December, 1831, made a written contract with John Buzan, whereby, it was agreed that Buzan should cultivate, work and improve a certain tract of land belonging to Seely and wife, and whereon they resided, according to their instructions, and secure the crops raised upon it; that he should divide the fruit produced in the orchard upon the land, with said Seely and wife; that he should provide Seely and wife with fire wood; that he should divide into two parts the pasture of said land, by a fence, the eastern part being for Seely and the western for Buzan; and that he was to keep in repair all the fences of said land; Seely and wife reserved to themselves all the houses, out houses and garden, on the north side of the spring branch running through the said lot. In consideration of the premises, Seely and wife contracted with Buzan that he should have and enjoy all of said tracts, except the reserved parts, during the life of Seely and wife, and upon their decease he should be absolutely possessed thereof, in fee simple. The bill avers performance of the contract by Buzan—that ever since the making of it, Buzan until his death, and since that time his family who were adults at the time have resided on the land. That in the year 1836 or 1837, Mrs. Seely died, and Seely became discontented with his residence and removed to Ralls county, without any fault or neglect on the part of complainants in performance of their duties and obligations towards him, and that after removing, he conveyed to one Thomas Hopkins in the year 1836, who is made defendant, the said tract of land in fraud of the rights of complainants who had always performed their contract until prevented by the act of Seely himself. That Hopkins paid nothing for the land, and that he had full notice of the contract by virtue of which Buzan held it. That Buzan in his lifetime by himself and his adult children were always ready and willing to perform their contract towards Seely, and actually did perform it until he left the county of St. Louis, in which the land lay.— That Hopkins has commenced an action at law to dispossess the family of Buzan from the land

in question, and the bill prays that he may be enjoined from prosecuting the same—that he be decreed to give up his deed to be cancelled, and for general relief.

An answer was filed by Hopkins, on oath, setting up non performance of the contract by Buzan, want of notice to Hopkins, and a general denial of equity in the bill. It was also averred that Hopkins had paid Seely, $400, for the land in cash, at the date of the execution of the deed. This last position, objected that Buzan having died and Seely being yet alive, although Buzan had died after Seely had left the county of St. Louis, the representatives of Buzan are not in legal contemplation capable of performing the contract.

Depositions were taken on both sides and witnesses examined at the hearing. At the hearing the bill and exhibits, and the answer and exhibits were read—and then plaintiff read, *First,* the deposition of John Chitwood, with whom Seely has resided since he left St. Louis county, by which it appears that Hopkins had never paid Seely any money for the land in question, but had executed his note, which Seely had assigned to Chitwood. He also proved, that the contract between Seely and wife and Buzan was talked of between the parties, viz, Seely and Hopkins. *Second,* the deposition of Garnsey, by which it appeared he knew all the parties to the bill—that they were all the children and representatives of Buzan; that he was subscribing witness to the agreement between Seely and wife and Buzan, and saw the parties execute it; and that the neighbors, of whom Hopkins was one, as a general thing, knew of the tenure by virtue of which Buzan and his family held the land, and were aware of the contract between him and Seely. *Third,* William Patterson, witness for complainant, testified that John Buzan went upon the land in question in 1831, and lived there at least five or six years, and until Seely removed from the county.— Buzan was son-in-law of Seely. Witness was at Seely's house when his wife was dying. He was there only two or three times while Buzan cultivated it. Saw it one summer just after the wheat was shocked up; he was then on a visit to Seely. Mrs. Seely died in the fall of the year. On this occasion, witness remarked one of Buzan's sons was hauling wood to the door, for fire. The next spring Seely left the county. Hopkins had been in the neighborhood several years before Seely left it. He lived at a mill frequented by the neighbors, and within a short distance of Seely's and Buzan's residence. To the best of the knowledge and belief of witness, the contract by which Buzan held the land was matter of notoriety in the neighborhood. Witness was the depositary of the written agreement. Sometime in 1839, Hopkins got a copy of it from witness—witness thinks this was about January, in that year—it was after Seely left the neighborhood, and at the time some difficulty occurred between Buzan and Hopkins about some corn. The Buzan farm was during the time Buzan cultivated it for Seely, as well cultivated as the generality of farms in that neighborhood. Witness passed it once when Buzan had got out a great number of new fence-rails for putting up the fences. This was soon after he had went upon the land. There was a common fence around it when witness saw it; that about thirty acres were under cultivation; that the pasture was divided by a cross-fence; that the largest part of the arable land was reduced to that condition by Buzan; that Buzan built himself a house on the south side of the spring branch. Seely's and Buzan's houses were about seventy-five yards apart. The spring branch runs east and west. Witness could not say how large a field was to the north of the branch. Buzan enlarged and cultivated it. The land was sometimes cultivated before Buzan went there. After he went there the pasture was divided by a cross-fence. Don't know precisely who made the fence, or when.

Thomas Clark, witness for complainant, knew Buzan and all his family, also Seely and his family. Some of Buzan's family were living on the land when Buzan died. He died in St. Louis.— Witness heard Hopkins before he purchased the land from Seely, say he did'nt like the Buzans or any of the family and that he wanted to get them out of the neighborhood—that he intended buying the land they were living on, and get them out of the the neighborhood. Hopkins spoke of the contract between Seely and Buzan. Witness mentioned it to him. Hopkins said it was of no account. Witness lived about two miles from Buzan—was there frequently; thinks the fences and crops were as good as the general run of them in that neighborhood, but he did not

notice them particularly.   Corn, wheat and oats were cultivated every year.   Witness can bleed, and knows something of the treatment of diseases, tho' not a doctor; was frequently at Seely's to see the old people.   He always saw fire wood there in cold weather, and never heard any complaint for the want of it.   Hopkins had been two or three years in the neighborhood when Mrs. Seely died.   Witness thinks the contract between Seely and Buzan was known to the neighbors generally.   It was frequently talked of and known to be in error.   Witness cannot speak particularly of the improvements made by Buzan, but believes that he enclosed and cultivated the field north of the branch.   On cross-examination, witness said that Hopkins told him that he did'nt like the Buzans and intended to get them out of the neighborhood, and the instrument by virtue of which Buzan claimed the land was of no account, or that the title of Buzan was of no account.— Witness thinks a written contract was talked of between him and Hopkins, but cannot say positively that a written contract was mentioned.

It was admitted that the land sold by Seely to Hopkins, was the same which is mentioned in Hopkins' answer, and which was and had been occupied by Buzan and his family.

Joseph Patterson, testified that Mrs. Seely died in the fall or winter of 1834-5, and that about a year afterwards Seely went up the country.   Buzan died about seven years ago   Witness has frequently seen the farm of Buzan, while Buzan lived there, but never noticed it particularly.   Witness lived at the mill spoken of by Garnsey, who owned the mill.   Garnsey told witness of the contract between Seely and Buzan.   Hopkins bought the mill from Garnsey, but did not come to the mill while witness was there.   The agreement was well known and talked of among the old neighbors.   Witness cannot say that he was at Seely's in cold weather while Buzan was working the land—was there in summer-time, but did not notice the crops particularly.   Does not know how much of the land Buzan cleared.   There were fences enclosing the pasture and the fields of the farm.   The fences were not remarkable one way or the other; they would keep out ordinary stock, but would not turn *breachy* cattle—some cattle will break any fence you can make with rails. Buzan's fence was good enough for ordinary purposes, and witness never heard of stock breaking through it and injuring the crops.   On cross-examination, witness said he did not speak with reference to any particular time.   Witness did not consider the fences to be in what he would call a good condition.   The main or public road passed to the north of the field, and close to the fence. The fence was near the northern line of the land, and the east boundary was the mill tract, and was a quarter of a mile from Seely's house.   There was a fence connecting the north and south enclosed fields; the pasture lay between them on both sides of the branch; the pasture was divided by a cross-fence.   Buzan put the fences up and kept them in repair.   They may be there yet, but witness has not seen them for a twelve month.

Elisha Patterson stated that Jonas Seely left the county of St. Louis for the upper country in 1835.   Hopkins came into the neighborhood before Mrs. Seely's death, and she died in the fall of 1834.   Seely and Buzan lived on the land in 1834 and 1835.   The contract between Seely and Buzan was in the opinion of the witness no secret, but witness never heard Hopkins talk of it. Witness frequently saw the land while Buzan occupied it and thought it was in good order—thinks the north field was enlarged by Buzan.   The pasture contained about five acres, the north field ten or twelve, and the southern fifteen or twenty.   Altogether, perhaps, there were from thirty to fifty acres under fence.   The fences were good enough to turn most stock, and witness never heard of any damage to the crops on this land from bad fences.   Witness frequently saw Seely at his house during winter, and always saw fire wood at his door.   On cross-examination, witness stated that Seely was now eighty years of age, at least.   He was feeble and decrepid in 1835, and unable to get his fire wood or do any work.   He had no slaves.   Witness knew him for thirty years of his life.   Mrs. Seely was until she was taken sick, much the stouter of the old people.— Witness believes that the Buzans cut Seely's fire wood after hauling it to the door.   The last time witness was at his house, Seely was alone—it was after his wife's death.   Some member of Buzan's family *staid* with him as a general thing, and waited on him.   Witness thinks the condition of Seely after his wife's death was forlorn and bad.   Seely wanted witness to come and live with him.

Thomas F. Blair, for complainants, had been acquainted with Seely and Buzan for twenty years —knew the land in controversy—it was cultivated with ordinary care and as well as the generality of farms in that neighborhood. Buzan put up the fence on the north side of the branch and enlarged the cultivated fields, and raised very good crops considering the land, which was thin. Thinks Buzan put up a cross fence dividing the pasture into two parts. The spring was in the middle of the pasture, was enlarged by Buzan, and the fence passed over it so as to leave part of the spring for the two families, between whom there was at one time a misunderstanding. Witness frequently heard the neighbors talk of the contract between Seely and Buzan, but never heard Hopkins say anything of it until some difficulty occurred between him and Buzan about some corn. Hopkins was in the neighborhood a year or two before the death of Mrs. Seely.— He lived at the mill already spoken of. It was generally known in the neighborhood that Buzan was to have the land upon the death of Seely. Witness was often at Seely's house in cold weather, he always had fires. Witness has made up fires for him. There was always fire wood at the door; and it was generally cut to the proper length. Sometimes witness cut it. Witness frequently saw different members of Buzans family there; and one or another member of it was there constantly. Once, while Mrs. Seely was unwell, Nancy Buzan stayed there several months.

On cross-examination, witness stated that, before Buzan went on the land, there was no fence dividing the pasture; he is not sure that the fence was put up the first year, and rather thinks it was put up the second year. It was a common worm-fence, about one hundred and fifty yards long. There was water in both pastures. Can't say how long the fence was kept up. Witness left the neighborhood in 1837. Was there when Mrs. Seely died. Mrs. Seely was very old and decrepid. The old people would somtimes ask witness to cut wood when he was there.

James C. Musick knew Seely and Buzan and the land in controversy. Does not remember when Mrs. Seely died; thinks Buzan died in 1840. Sometime in 1835 and 1836, Buzan showed witness the contract between him and Seely. Hopkins was in the neighborhood then, and Seely had not left it. Witness had been justice of the peace for severel years and Buzan asked him his opinion of the contract. Witness does not remember having heard Hopkins say anything of the contract until after he heard that Hopkins had a deed for the land. Witness was not on the land more than twice while Buzan worked it. It was a small farm, fenced in and cultivated in corn. The pasture was divided by a cross-fence before Seely's death.

On cross-examination, witness said that there had been some disagreement between Buzan and Seely, which led Buzan to consult witness. Buzan said it was impossible to please the old-man; that he was irritable and childish.

Clement Brown, witness for defendants, testified that he lived half a mile from Seely. That he went there in the spring of 1834. Seely lived to the north and Buzan to the south of the branch. Seely went to Ralls county in the spring of 1835. On the north field, the fence was a common fence; next to the road it was tolerably good; near the house it was not so good. Witness generally saw wood at the house; sometimes it was more, sometimes less. Witness never cut wood or carried it into the house for Seely. There was an interval between the north and south field when Buzan first went there—this space was open in 1835, and is open now. Seely was there then. Witness was at work at the mill for Hopkins in 1835 and 1836. The pasture was enclosed in 1836; no traces or remains of fences across the pasture before that time. Witness lived and lives west of the tract of land in question, and the land was between the mill and witness' house. In 1835, a crop of corn was raised on Seely's place, and it was cribbed and penned. Seely was feeble and unable to work. Witness does not know what became of the corn—heard that Hopkins had got one load—he said he had bought it. Buzan came to the mill in a passion, charged James with taking the corn, and forbade his taking any more. This was in the fall of 1835.

On cross-examination, witness said he did not remember a fence dividing the pasture in 1834. Late in the fall of 1836, saw Seely's cow and horse running in the range. There was some milk sickness in the neighborhood; and cows and horses are kept up until the frost has killed the vegetation. They can't be kept up always, and are frequently seen running at large. Saw Seely's

in the range in 1835. In that year, Mrs. Buzan asked witness to go and see Mr. Seely and ask him to come and live at her house, where she could make him comfortable and attend him.— Witness delivered her message to Seely, who got into a passion and said he would never put his foot inside of their house—that Buzan had fallen out with him and ordered him out of it. Witness simply told Mrs. Buzan that Mr. Seely would not come, and did not report his observations. She said she was sorry Seely was frequently petulent and ill-tempered, as old people often are.— Witness knew nothing personally of the falling out between Seely and Buzan. Witness frequently saw Nancy Buzan (now Mrs. Watson) at Seely's house, waiting on the old man—also, saw Hannah Southworth there, and Buzan's boys doing the same thing: never saw the place without fire wood in cold weather. Sometimes it was all cut to a proper length for being put on the fire, and sometimes not. Witness was never there after the death of Mrs. Seely, without seeing one of Buzan's family there, waiting on the old man. Mrs. Buzan's message was delivered after Mrs. Seely's death, in the fall of 1835. The old man did not stay there long afterwards. Heard there was a contract by which Buzan was to have the land after the death of the old man, but never heard Hopkins speak of the contract until he had bought the land.

Timothy Bray testified that he lived at the mill from 1829 to 1833—he frequently passed Seely and Buzan's field, and remembers the ten acre lot on the north. The pasture was not enclosed at first. Witness uncertain whether it was enclosed or not in 1833, but he thinks not. Witness left in 1833, (September)—did not particularly remark the fences—that towards the road was pretty good. Visited Seely's house as often as any one in the neighborhood. There were no fences enclosing or dividing the pasture, up to 1833. Witness frequently saw Buzan's sons hauling fire-wood to Seely's house, and also saw wood there which had been hauled already. Don't know who cut the wood into lengths for the fire, nor why the old man left his house. Witness left the neighborhood in the lifetime of the old lady.

Laban Landon testified that he had known Seely and Buzan since 1824, and until Seely left the county. He lived about five miles from Seely's, and was frequently at his house when Buzan first went on the land. Seely left in 1835. His wife died in the fall of 1835, and he left in the latter part of the same year. Seely was brought to witness's house by an old gentleman named James Stuart—he stayed there until the following spring, when he went to Ralls county. Seely sent word to witness once or twice by Nancy Buzan to come and see him, and witness refused to go, but told Stuart to go. Seely was feeble and almost helpless; he was probably sick. He was very old—about 73 or 74, as witness heard him say.

Wm. James testified that he was acquainted with Buzan and Seely more than thirty years ago. Remembers the pasture between the north and south fields. Witness went to the mill in the winter of 1835 and 1836, and continued there two years. Seely quitted the place in 1835. The mill was three quarters of a mile from Seely's. In the winter of 1835–'6, witness frequently walked through the pasture, which was not enclosed. Witness remembers the fences round the fields: they would turn most stock, but not breachy stock: they were not lawful fences. Witness knows nothing of the manner in which Seely was supplied with fire-wood. Buzan and Seely occupied the place together for four or five years. Mrs. Seely died in the fall of 1834, and Seely went to Ralls county in the spring of 1835. He had left the premises some time previous.

Defendant then read the deposition of Jonas Seely. This recited the agreement made with Buzan minutely and accurately. The deposition then goes on to state, that deponent requested Buzan to sow two acres of ground in wheat, and he sowed only one and a half acres; that a good crop of wheat grew from this, which Buzan cut and shocked up, but refused to thresh, whereby it was rotted. That on the remainder of the field of ten acres, Buzan grew a crop of corn, and while it was just cleverly hard, Buzan went into the field with a basket and pulled corn promiscuously and fed it to his hogs—the balance he put into deponent's crib, being about eighty bushels. That in November, 1834, deponent's wife died, and he himself was taken sick and went to Buzan's house and mentioned to Buzan's wife that he was in a suffering condition for wood, whereat she was very much incensed and ordered him out of her house; and afterwards, Buzan

22

came to deponent's house and cursed him and threatened him most insultingly. That deponent's sickness grew worse, and that Buzan still refused to furnish him with wood, wherefore he sent for Laban Landon, who took him to his (Landon's) house, where he stayed until next spring, when returning to his own house, he found most of the corn gone—his spring house torn down and taken away—one of the houses he had lived in used as a stable; and he further states, that Buzan had, that spring, taken possession of his garden, and the premises therefore became so uncomfortable that deponent could that deponent could not remain there any longer and went to John Chitwood's in Ralls county. That he often notified Buzan to save the corn fodder, which he refused. That the trees in the orchard were divided the first year, and that Buzan marketed his share and then turned the cattle in and destroyed Seely's share, so that he never got any.

The agreement made between Seely and wife and Buzan was as follows: "Article of an agreement made and entered into this first day of December, eighteen hundred and thirty-one, by and between Jonas Seely and Elizabeth Seely, his wife, of the first part, and John Buzan of the second part, all of the county of St. Louis and State of Missouri, witnesseth: That, they said Buzan of the second part doth agree to put ten acres of ground under good fence and cultivation in the north-east corner of the tract of land that the said parties now live on, it being the same tract of land that the said Jonas Seely purchased of John N. Seely, containing one hundred and fifty arpens, as appears by deed bearing date February 13, 1817; and the said Buzan obliges himself to cultivate the said ground in a good manner annually as the said Seely may direct, that is, in corn, wheat, oats, or a part, or in such proportion as the said party of the first part may think proper; and the said Buzan is to harvest the crop that is raised on the said field in due time, and to crib the corn, thresh the wheat or oats, and to put up in good order all other parts of crops so raised on said ground; also, to save the corn fodder growing on said field; and the said parties is to divide the fruit of the orchard equally by the division of the trees annually: and the said Buzan further obliges himself to make a cross fence through the pasture, and the said Seely is to have the west part and the said Buzan the east part, and the said Buzan is to keep all the fencing above mentioned in good order, and to keep the said *Seelies,* the said Jonas and Elizabeth, in fire-wood; and the said parties of the first part reserve to themselves all of the houses, out houses, and garden on the north side of the spring branch; and for and in consideration of the above performance by the said Buzan, he, the said party of the first part, doth give and grant unto the said Buzan free privilege of all and singular the premises therein mentioned, of all and every part of the said tract of land, the part yet afore reserved only; and at the decease of the said party of the first part, the said Buzan shall be entitled to a complete title of all and every part of the whole tract, the same to be made by any authorized person or legal authority. The above instrument of writing being fully understood by and between the parties, they have hereunto set their hands and seals the day and date above written. JONAS SEELY, [L. S.]
ELIZABETH SEELY, [L. S.]
JOHN ⋈ BUZAN." [L. S.]

The deed from Seely to Hopkins was dated 16th March, 1836, and admitted to record in St. Louis on the 2nd April, 1836. The agreement between Seely and Buzan was never recorded.

The court dismissed the bill at the hearing. The finding and decree of the court was in the following words: "Injunction dissolved and bill dismissed at the costs of complainants. The court adopts and proceeds upon two grounds set up in the answer of Hopkins. 1. Non-performance of contract. But were it otherwise,—2. From the subject matter of the contract and the proofs establishing the relationship between, and the attendant circumstances and situation of the parties, the court is of opinion that the contract was personal, involving personal confidence and trust, and was entered into with a view to a permanent arrangement, and that therefore, although for the most part, if not entirely capable of being performed by a third party, yet not admitting of a substitute without the consent of Seely. The question of notice, in the view of the cause taken by the court, becomes immaterial."

To this decree, complainants excepted and filed a motion for a re-hearing, and assigned in sup-

port of it, the following reasons : 1. That the decree of the court in this behalf is against the weight of the evidence in the cause and the exhibits therein. 2. That it is against law. 3. That it is against the evidence and exhibits in said cause produced at the hearing thereof. 4. That it is against equity and good conscience. 5. Because, by the law of the land and the testimony adduced upon the hearing, the said decree ought to have been for the complainants—which motion being overruled, complainants sued out this writ of error.

## GANTT, *for Plaintiffs*.

1. The evidence and exhibits produced at the hearing, show that the decree of the court below should have been for the complainants.

2. The benefits of the contract made between Seely and Buzan, upon the death of the latter descended to his legal representatives. 2 Cruise, p. 28, secs. 6, 7 and 8.

3. Seely, having left St. Louis county in the lifetime of Buzan, cannot, nor can any one claiming under him, set up the death of Buzan as a reason for vacating the contract. 2 Cruise, p. 33, sec. 25; 1 Strange, 535; 1 T. R., 638; 2 Johns., 209; Fonbl. Eq., 394, 395.

## SPALDING, *for Defendants*.

1. The article between Seely and Buzan gave Buzan only an interest on conditions, to-wit, on the performance by Buzan of the stipulations in the article, and those *never having been performed, but violated,* neither he nor his heirs have any right, and they must have been performed in Buzan's lifetime. 2 Cruise, p. 30, sec. 9; 1 Bac. Abr., 661, 665; 2 Cruise, p. 3, sec. 6; 1 Shepherd Touch., 117.

2. There is no equity in the bill, and there ought not to be any decree. The old man is still living, and even supposing the agreement to be in force, and in the sense contended for by complainant, yet Seely has a right to the possession of the part secured to him for life, and Hopkins, his grantee, has the same right; and if the agreement under seal gave the right of use and possession to Buzan and heirs, and Hopkins had notice of it, then the defence of Buzan was good and available at law as to the part of Buzan. The right, if any, is a right of possession, and that right is under the hand and seal of Seely. This, of course, would be as available at law as in equity.

3. There is no sufficient proof of notice of the agreement to affect Hopkins. He denies it positively in his answer. This is not contradicted by two witnesses, or what is equivalent; only one witness says anything on the subject of Hopkins ever having heard or known anything of the agreement before he purchased, and this witness, Thomas Clark, speaks doubtingly about it.—Hopkins came there a stranger in 1834, and is not chargeable with what the old acquaintances of Buzan and Seely might have known or heard of their affairs. It appears that he never said anything indicating his knowledge of the contract until after he purchased—that is, the testimony is all to that effect, except Clark's.

4. If the complainants were entitled to any decree at all, it would be only as to Buzan's part, and not as to the part *reserved,* though the injunction was for the whole. There is no forfeiture by Seely of his rights there, by his going away and omitting to call on Buzan's representatives to fulfil the stipulations of the contract.

5. In this contract, Buzan was amply paid each year for what he was to do for the old man.—He enjoyed all the farm, except ten acres, and a part of the pasture and of the fruit. It appeared that he so considered it, and was willing to leave it at any time, and so expressed himself. There was nothing, therefore, hard in the construction which I put on the contract. It was a race of lives. If Buzan outlived the old man and fulfilled the stipulations, he was to have the

whole farm—was to be rewarded by being sole heir. If he should die first, (and of this the probability was very small) then his right to the farm was gone; the old man would have to make new arrangements for his support, but, in the meantime, he, Buzan would have had the use of most of the farm, rent free, or rather paying rent by fulfilling the stipulations of the contract.

6. The bill prays for injunction and for general relief. But there is no general relief that can be afforded in any event. There can be no specific performance. The title is not to be vested in Buzan till Seely's death, and he is still living; and even were the old man dead, the title is to be vested in "*Buzan,*" not any other person.

SCOTT, J., *delivered the opinion of the Court.*

A determination of this cause, according to the strict principles of conditions at the common law, without regard to extrinsic circumstances, showing the relationship of the parties to the contract to each other, would be productive of great injustice. It is an admitted rule, that in the construction of wills, we may put ourselves in the situation of the testator. With this view, evidence must be admissible of all the circumstances surrounding the author of the instrument. This doctrine, so reasonable in itself, which has been applied to wills, is equally applicable to the construction of contracts. Greenleaf, sec. 287. The principles of law cited by the appellants in support of their claim, are unquestionably sound, but cannot with propriety be resorted to for the determination of this controversy. An application of them would be fulfilling the contract to its letter, while its true meaning and intention would be utterly sacrificed. The appellants, though not originally parties to the contract, yet coming in as volunteers, must take the same with all the infirmities attached to it by the conduct of their ancestor. A material circumstance in this case, is the relationship between the parties to the contract, as also the extreme age of the parties agreeing to make a conveyance of the land in dispute. It is impossible to read the record without coming to the conclusion that the object of old Mr. Seely, in agreeing to make a conveyance of the land to Buzan, his son-in-law, was to obtain protection and support for himself and wife during the short remainder of their lives, offering suitable inducements for that purpose. Whether the contract was complied with as it should have been, is a fact that could only be known to Seely himself. Persons may have seen fire-wood at his house at particular times, but whether it was constantly supplied does not appear. If Seely himself, who was a witness in the cause, is to be believed, his expectations in making the contract were sadly disappointed. He utterly denies that the contract on the part Buzan was conformed to in any par-

ticular. Placing his son-in-law's and daughter's residence within a few yards from his own, Seely must have naturally looked to the solace of their countenance and society, or at least he must have expected that they would not forget that he was their father. So far from this, he was driven out of her house by his daughter, in the absence of her husband, who, on his return, went to the house of Seely and cursed him. Such treatment produced its natural consequences. Filial ingratitude drove Seely from his home; he sought an asylum elsewhere, and as the only means of his support, he conveyed away the land which he had promised to his son-in-law. If such were the feelings of Buzan towards Seely, how hard it is to make us believe that the contract on his part was complied with as it should have been!

The appellants are here in a court of equity seeking relief, and the relief sought is in the nature of an application for a specific performance of a contract. Such applications are always to the discretion of the court. Courts of equity will not interfere to decree a specific performance, except in cases where it would be strictly equitable to make such a decree. He who does inequity shall not have equity. "Honor thy father and thy mother, that thy days may be long in the land which the Lord thy God giveth thee." The object of Seely in entering into this contract is entirely defeated. What court would place Seely in a condition in which he would be forced into a place from which he had been driven by harsh treatment, or be compelled to beg or starve. After the indignity offered to him at his home, it cannot be said that he prevented a compliance with the contract on the part of Buzan by going away. On no principle was he compelled to remain at his residence under the circumstances, or forfeit his land. Why should he remain exposed to the cruelty of those who were so much interested in his death, and who had showed so clearly that they had no regard for his comfort or his feelings? By refusing to interfere, no decision is made which affects the right of the parties to proceed at law for any redress, by way of damages, to which they may be entitled. The effect of a refusal is only a declaration that the party has not presented a case which entitles him to equitable relief.

The other Judges concuring, the decree will be affirmed.